BANGOR RAILWAY & ELECTRIC COMPANY

*vs.*

INHABITANTS OF ORONO.

Penobscot.    Opinion July 26, 1912.

*Appeal.   Adjudication.   Apportionment.   Decree.   Electric   Cars.*
*Legislature.   Highway   Bridge.   Jurisdiction.   Notice.   Railroad*
*Commissioners.   Repairs.   R. S., Ch. 51, Sec. 75.*

1.  For many years prior to the organization and operation of the Bangor Electric Railroad, the town of Orono had maintained a bridge across the Stillwater branch of the Penobscot River which was in every respect adapted and suitable for all purposes of a highway bridge.

2.  Upon the extension of the railroad into the town of Orono, the railroad company, under proper authority, appropriated a part of the bridge to its own use and operated its cars thereon.

3.  In consequence of this increased weight imposed upon the bridge, the structure gradually weakened under the weight and vibration of the cars, until the 28th day of July 1911, when its further use was prohibited to the railroad company by order of the Railroad Commissioners.

4.  The Railroad Commissioners suo moto gave notice of a hearing to be held on July 28, 1911, at which time the Commissioners determined, ordered and decreed that said wooden bridge shall be rebuilt by constructing in place thereof a steel bridge resting upon granite or concrete piers and abutments which shall be suitable and safe for both highway and street railway uses. That said bridge shall be built by the Bangor Railway and Electric Company under the direction of said board of railroad commissioners and to its satisfaction.

5.  The railroad commissioners were vested with authority to direct the railroad company to order a renewal of the bridge in the place of the old one in accordance with their order, and to determine who shall bear the expense of repairs, renewals, strengthening or rebuilding or to apportion the expense between the railroad company and the town of Orono.

On report. . Appeal denied.   Decree of Railroad Commissioners affirmed.

This is an appeal of the Bangor Railway and Electric Company from a decree of the Railroad Commissioners ordering the Railway and Electric Company to build a new steel highway bridge across the Stillwater branch of the Penobscot River at Orono in place of the present wooden structure.

*E. C. Ryder,* for plaintiff.

*C. J. Dunn,* for defendant.

SITTING: WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, KING, HANSON, JJ. BIRD, J., did not concur.

SPEAR, J.   For many years prior to the organization and operation of the Bangor Electric Railroad the town of Orono had maintained a bridge, across the Stillwater branch of the Penobscot River, which was in every respect adapted and suitable for all the purposes of a highway bridge.   Upon the extension of the railroad into the town of Orono the railroad company, under proper authority, appropriated a part of this bridge to its own use and operated its cars thereon.   In consequence of this unusual and increased weight imposed upon the bridge, which was neither anticipated nor necessary in its original construction, the structure, although repaired and strengthened from time to time, gradually weakened under the weight and vibration of the cars, until on the 28th day of July, 1911, its further use was prohibited to the railroad company by order of the railroad commissioners.   This suspension of the use of the bridge resulted in operating the road by running the cars from each end of the bridge, the passengers, whatever the weather conditions, being obliged to walk the bridge in order to take the car and pursue their journey in either direction.   This condition of inconvenience to the company and annoyance to the public has continued to the present time.

On the 22nd day of July, 1911, the railroad commissioners, suo moto, gave notice of a hearing to be held on July 28, 1911, at which they would "determine the repairs, renewals for strengthening of parts, or if necessary, the manner of rebuilding said bridge, required to make the same safe for the uses to which it is put.   And said railroad commissioners will then and there further determine by whom the expenses of such repairs, renewals, strengthening or

rebuilding of said bridge shall be borne, or will apportion the same in such manner, as shall be deemed by said board just and fair." Upon this notice the commissioners met and adjourned the hearing thereon to August 9, and again from August 9 to October 13, 1911, when all parties in interest were fully heard and the various matters involved in the notice were adjudicated as follows: "It is therefore hereby determined, ordered and decreed that said wooden bridge shall be rebuilt by constructing in place thereof a steel bridge resting upon granite or concrete piers and abutments, which shall be suitable and safe for both highway and street railway uses.

"Said new bridge shall be built by said Bangor Railway and Electric Company upon plans to be submitted to and approved by the Board of Railroad Commissioners, and all work thereon shall be done under the direction of said Board and to its satisfaction.

"The expense of rebuilding said bridge is hereby apportioned between said Bangor Railway and Electric Company and said town of Orono in the manner following:

"Upon the completion of said new bridge by said Bangor Railway and Electric Company, and its approval by the Board of Railroad Commissioners, the town of Orono shall pay said Bangor Railway and Electric Company, as its just and fair proportion of said expenses, forty per cent of the same; but said town of Orono's proportion of said expenses so to be paid said Bangor Railway and Electric Company shall in no event exceed the sum of twelve thousand dollars.

"And it is hereby further decreed that after the completion of said new bridge, the Bangor Railway and Electric Company shall thereafter maintain the planking between its rails, and the town of Orono shall maintain all planking for the roadway; and all other expenses of repairs and maintenance of said bridge shall be borne equally by said railway and said town."

From this adjudication the railroad company seasonably appealed to the next succeeding term of the Supreme Judicial Court to be held in Penobscot County, and within the proper time filed in the office of the board of railroad commissioners its reasons of appeal in substance as follows:

1. That the bridge described in the decree is a highway bridge which the town was bound to maintain and keep in repair and not

the railroad company, and that the commissioners had no authority in law to order the company to build a new structure or bridge.

2.   The second reason in its effect upon the decision of the case is precisely like the first.

3.   That if the railroad company can be required to build a new bridge, then the railroad commissioners have not fairly or justly apportioned the expense of such building between the railroad company and the town of Orono.

4.   That if the railroad commissioners had authority to compel the railroad company to build a new bridge, then they have not fairly and justly apportioned the expense of maintaining said bridge after it is constructed.

The real issue in this case is, whether the railroad commissioners were vested with authority to direct the railroad company to rebuild a new bridge in the place of the old one in accordance with their order and decree, and depends entirely upon a question of statutory construction.   Revised Statutes, Chapter 51, Section 75 contains the following provision relating to the power of railroad commissioners over the repair, maintenance and construction of bridges appropriated for use in the operation of electric cars, to wit: "Bridges erected by any municipality, over which any street railroad passes, shall be constructed and maintained in such manner and condition, as to safety, as the board of railroad commissioners may determine. Said board may require the officers of the railroad company and of the municipality to attend a hearing in the matter, after such notice of the hearing to all parties in interest as said board may deem proper.   Said commissioners shall determine at such hearing the repairs, renewals, or strengthening of parts, or if necessary, the manner of rebuilding such bridge, required to make the same safe for the uses to which it is put.   They shall determine who shall bear the expenses of such repairs, renewals, strengthening or rebuilding, or they may apportion such expenses between the railroad company and the city or town, as the case may be, in such manner as shall be deemed by the board just and fair, and shall make their report as hereinafter provided."

The defendant in argument raises two fundamental objections to the decree of the commissioners.

1. The railroad commissioners have no jurisdiction to order the Bangor Railway and Electric Company to construct a new bridge, in renewal of the old one.

2. After said bridge has been constructed by the Bangor Railway and Electric Company, in accordance with the decree, the railway company has no power to enforce payment of any part of the costs from the town of Orono.

It is the opinion of the court that a fair and reasonable construction of the above statute is calculated to answer both of the above contentions in the negative. In construing this statute the appellant's counsel in argument admits, and very properly, that the Legislature had undoubted power to confer upon the railroad commissioners full authority to issue orders and decrees in harmony with those issued in the case at bar, but that the present statute does not in terms, and was not intended, to confer such authority. In other words, the constitutional right of the Legislature to delegate such power to the railroad commissioners is not questioned, and it may be proper to add, could not be reasonably questioned, in view of the numerous decisions in the courts of the various states, and especially in the Supreme Court of the United States.

The defendant contends, in view of the plain statutory requirements, that towns shall be responsible for the building of highways and erection of bridges and for the maintenance thereof, that it was the duty of the railroad commissioners in the first instance to impose the renewal or rebuilding of this bridge upon the town of Orono, and then apportion the expenses between the town and the railroad company. While this contention is undoubtedly true, with reference to building bridges required for the vehicles of travel when these statutes were enacted, it hardly seems credible that the Legislature in enacting the above statute intended to impose upon the towns, for the benefit of private corporations, a burden so oppressive, if not destructive, as that of compelling a municipality to assume the enormous expense of erecting a bridge suitable for the operation of electric cars. But it is said the relief involved in this contention is found in the right of the railroad commissioners, after the structure is completed to apportion the expense; but in case of a bankrupt road, or even one without available assets, such an apportionment would become a formal declaration of ruthless

injustice.  We are unable to believe that the Legislature ever contemplated any such construction of this statute, nor does the language of the statute in any sense require it.  While, as the defendant contends, statutes are to be construed, in pari materia, it is yet apparent that the statute in question was not calculated to bear any relation to the various statutes cited by the defendant, tending to establish the primary duty of municipalities to see that highways, including bridges, are opened and kept open "so as to be safe and convenient for travelers with horses, teams and carriages." In *Doherty* v. *Ayer,* 197 Mass., 241, it was held that a similar statute referred only to carriages drawn by animal power.  Nor did this case define the status of an electric car, operated under a franchise conferring special privileges, but that of an automobile, differing from carriages in its use of the road, only in applying automatic instead of animal power.

On the other hand, it must have been evident to the Legislature, when the statute was enacted, and, in fact, it had been so held in this State, that the location of electric roads and the operation of electric cars constituted a new use of the highways, specially granted to private corporations, involving a method of locomotion akin to that of steam railroads and fraught with similar dangers to the public, and demanding for the protection of the public similar oversight on the part of the railroad commissioners.  In view of these new privileges and uses, the Legislature contemplated, in fact knew, that the bridges along the highways, traversed by electric roads, would, to a greater or less extent become the carriers of electric cars, subjected to an unintended and dangerous weight, and would at once become a subject of controversy between the railroads and municipalities as to upon whom, under the law regulating the maintenance of bridges by municipalities, and the franchises granting the use of the bridges to the railroads, should devolve the duty of repairing, strengthening or rebuilding the bridges for the new use to which they were to be put.  It is obvious that it was impossible for the Legislature to prescribe by law in advance or to designate in a charter just what should be done to any particular bridge in order to make it safe for electric travel.  It was, therefore, compelled in the very nature of things to legislate in somewhat general terms with reference to this subject, and to vest in some tribunal,

under general powers, authority to investigate and discretion to determine the particular thing to be done, in the particular instance under investigation, essential to the protection and safety of the public. It is also perfectly clear that it was the intention of the Legislature to impose these duties, whatever they might be, upon the railroad companies. In view of these purposes they enacted the statute in question. It should be observed that this statute relates to repairs, renewals, strengthening and rebuilding and not to the original erection of bridges. In the light of these general observations now arises the question at issue. Did the Legislature intend to confer upon the commissioners authority to direct the railroad company to rebuild the bridge in question? That part of the statute conferring the authority to be exercised by the commissioners reads as follows: "Said commissioners shall determine at such hearing the repairs, renewals, or strengthening of parts, or if necessary the manner of rebuilding such bridge required to make the same safe for the uses to which it is put." From this language it will be observed that the right of the commissioners to determine the "repairs," "renewals," "strengthening of parts" and "the manner of rebuilding" the bridge fall in precisely the same catagory. In other words, this language confers upon the commissioners the same authority to order the company to rebuild the bridge as it does to order the repairs, renewals or strengthening of parts. It nowhere, in terms, confers upon the commissioners authority even to order repairs. If then the contention of the defendant is sound, that the railroad commissioners were authorized to determine only what repairs, renewals, etc., were to be made or in what manner the bridge was to be rebuilt, then it left the time in which all these things should be done entirely to the discretion of the railroad company, and withheld from the commissioners the only authority which would render their determination of any value to the public, namely, authority to order done what they determined necessary to be done. To be sure they could inhibit the use of the structure until repaired or rebuilt, but this would be inconsistent with the duty imposed upon the railroad company by its franchises by which it is bound to keep its entire road in operation for the convenience of the public. It cannot be reasonably conceded that the Legislature ever intended to enact a statute, purporting to enable the commissioners to issue

decrees, but so impotent as to strip them of power to enforce their execution. While the statute does not in words say that the commissioners may order the construction of repairs, renewals or strengthening of parts, or the rebuilding of a bridge, it was nevertheless, in view of the purpose of the statute and the end to be reached, the unquestioned intention of the Legislature to confer such power.

Under the rules of statutory construction, it is unnecessary that the language of the statute shall be specific in conveying the meaning which the Legislature intended. These rules have become matters of common knowledge. We refer, however, to a few cases. In *Orono,* applts. v. *Bangor Railway and Electric Co.,* 105 Maine, 428, between these same parties, it is said: "That which is within the intention of a statute, is within the statute, as if it were within the letter of it." Also: "The literal import of language used in statutes is often seemingly at variance with what was obviously intended. In such case the intention and not the literal import is to govern." In *Carrigan* v. *Stillwell,* 99 Maine, 434, in an opinion by the late Chief Justice Wiswell, it is said: "A thing may be within the letter of the statute and not within its meaning, and within its meaning though not within the letter. The intention of the law-maker is the law." In *Winslow* v. *Kimball,* 25 Maine, 495 the court say: "Statutes are to receive such a construction as must evidently have been intended by the Legislature. To ascertain this, we must look at the object in view, to the remedy to be afforded and to the mischief intended to be remedied." In *Board of Com's.* v. *Anderson,* 68 Federal Reporter, 341, it is said: "The guiding star and controlling principle of all statutory interpretation is always the intent of the Legislature." It is further said in many decisions: "A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter." It is the opinion of the court that a reasonable construction of the statute in question conferred upon the railroad commissioners jurisdiction to issue the order and decree, imposing upon the railroad company the duty of rebuilding the bridge in controversy.

The second objection that the railroad company could not enforce its claim against the town for the proportion of the costs imposed upon the town by the commissioners is also untenable. The clauses

of the statute relating to the apportionment of the expenses between the railroad company and the town are unambiguous and clear. That the Legislature has a right to impose upon the town the burden of aiding in rebuilding this bridge for the accommodation both of the railroad company and the municipality cannot be questioned. In the recent case of *Inhabitants of Orono,* appellants, v. *Bangor Railway and Electric Company,* 105 Maine, 423, it was so decided. This was a case in which the railroad commissioners ordered the railroad company to repair this same bridge and apportioned the cost of repairs, to be paid respectively by the railroad company and the town. Upon appeal by the town, all questions raised involving the authority of the commissioners to impose and apportion the cost of repairs were settled in the opinion of the court and the jurisdiction of the commissioners to adjudicate the questions fully established; the only question left open to review being one of fact as to whether the apportionment was manifestly illegal or unjust. It therefore follows that the town will become responsible to the railroad company for the amount which it may be required to pay by the decree of the commissioners provided such amount is not manifestly illegal or unjust.

The third reason of appeal is based upon the ground that the commissioners have not fairly or justly apportioned the expense of the building of the bridge between the railroad company and the town of Orono; and the fourth reason of appeal declares that they have not fairly and justly apportioned the expense of maintaining the bridge after it is constructed. Both these reasons raise questions of fact which are clearly within the province of the commissioners to determine. In view of the fact that the town had a bridge that was in all ways proper and suitable for the travel for which the town was to maintain it, and so far as appears, would have continued in this condition for many years, and that the necessity of a new bridge is occasioned wholly by the act of the railroad company, we find no data which would warrant us in the conclusion that the decree of the railroad commissioners with reference to the apportionment of costs or the apportionment of maintenance were manifestly illegal or unjust.

> *Appeal denied.*
> *Decree of railroad commissioners affirmed.*